JAMIE LACY,

        Plaintiff,

        v.                                           Case No. 23-cv-0765-bhl

KOHL'S CORPORATION,

        Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On February 28, 2023, Plaintiff Jamie Lacy was terminated from her employment at Defendant Kohl's Corporation for violating its leave policies. In response, Lacy filed this lawsuit, claiming that her termination violated the non-interference and retaliation provisions of the Family and Medical Leave Act (FMLA). With the benefit of discovery, Kohl's has moved for summary judgment on all claims. Because the undisputed facts establish that Lacy violated the company's leave policies and was subject to termination regardless of her FMLA rights, Kohl's motion for summary judgment will be granted.

### FACTUAL BACKGROUND[1]

**1. The Parties**

Kohl's is a retail store operator headquartered in Wisconsin and incorporated under Wisconsin law. (ECF No. 5 ¶7.) Lacy was a Kohl's employee from August 2015 until her termination on February 28, 2023. (ECF No. 28 ¶¶1, 91.) She began her Kohl's employment as a Call Center Customer Service Representative but was later transferred to the Credit Bureau Dispute Team. (*Id.* ¶¶1, 3.) Beginning in February 2022 and continuing through her termination, Lacy was supervised by Nicole Heim. (*Id.* ¶4.)

---

[1] The factual background is derived primarily from both parties' proposed undisputed facts, (ECF Nos. 28 & 32), and supporting evidence. The Court also considered the parties' joint UA absence chart, (ECF No. 48), which visualizes Lacy's absences during the relevant time period and how each party believes the absence should be coded. Any other documents cited to are utilized solely to provide dates that were not in either party's proposed undisputed facts.

### 2. Kohl's FMLA Leave Policies and Procedures

Kohl's maintains an FMLA leave policy consistent with 29 U.S.C. §§ 2601–2654. (*Id.* ¶28.) Under the policy, employees submit FMLA leave requests to a third-party administrator, Sedgwick Claims Management Services, Inc., which is responsible for determining the employee's eligibility for leave. (*Id.* ¶¶29–30.) While FMLA leave is generally taken consecutively, 29 U.S.C. § 2612(b)(1), Kohl's policy allows approved employees to take "intermittent leave" for non-consecutive periods, (ECF No. 28 ¶¶31, 52.) As with all forms of FMLA leave, an employee seeking FMLA intermittent leave is required to request that leave through Sedgwick, which determines the employee's eligibility based on documentation provided by the employee. (*Id.* ¶¶33–34, 36–37.)

An employee's FMLA leave request is considered "pending" during the period in which Sedgwick is evaluating the request. (*Id.* ¶36.) When a leave request is pending, and after the request is approved, Kohl's employees wishing to utilize their FMLA intermittent leave are required to follow a two-step process. (*Id.* ¶¶31, 37, 39.) First, the employee must submit the leave request to Sedgwick, which reviews the submission and then notifies both the employee and Kohl's of its decision on whether the leave is protected. (*Id.* ¶¶30–31, 33–37.) Second, the employee must also log and appropriately code the absence as FMLA intermittent leave in Kohl's online attendance system, Verint. (*Id.* ¶¶16, 24.)

As to the first step, Kohl's policy requires an employee to submit an FMLA intermittent leave request to Sedgwick on the day the employee is absent. (*Id.* ¶31.) Failure to report an absence to Sedgwick timely may result in Sedgwick denying the absence FMLA protection. (*Id.*) Only Sedgwick has the authority to overturn its decision to deny an absence FMLA protection. (*Id.*) Kohl's policy is less strict with respect to the second step. If an employee is unable to enter the absence into Verint immediately, Kohl's permits the employee's supervisor to enter the absence for the employee. (*Id.* ¶44.) Supervisors have no role, however, in reporting the FMLA leave absence to Sedgwick. (*Id.* ¶46.)

When Sedgwick approves a request for FMLA intermittent leave, it will specify an approved time period for the leave (i.e., from January 1, 2022 through September 1, 2022). (*Id.* ¶52.) Once that period expires, the employee can no longer take FMLA intermittent leave. (*Id.* ¶¶53–56.) Typically, however, before the approved period expires, Sedgwick will notify the employee and ask whether he or she wishes to extend or obtain authorization for a new period of

FMLA intermittent leave. (*Id.* ¶53.) If the employee wishes to have a further period of leave, the employee must reapply, and the approval process begins again. (*Id.*)

Kohl's also offers its Credit Division employees 120 hours of unplanned absences (UAs) over the course of a year. (*Id.* ¶¶10, 13–14.) Employees are permitted to take 60 UA hours in the six-month period between April 1 and September 30 and another 60 hours in the six months between October 1 and March 31. (*Id.* ¶14.) Employees can use UAs for any absences that are "not scheduled or approved in advance" and for which the employee "do[es] not have any leave available to cover the time away from a scheduled shift." (*Id.* ¶11.) Employees thus use UAs for unforeseen events and circumstances that prevent the employee from reporting to work. (*Id.* ¶13.) As with FMLA leave, employees are required to report and appropriately code their UAs in Verint. (*Id.* ¶16.) If an employee fails to report an absence, Kohl's automatically codes the absence as an UA, regardless of the unreported reason. (*Id.* ¶18.)

If an employee exceeds his or her allotted UA hours during a particular six-month period, the employee's UA balance turns "negative." (*Id.* ¶19.) Under Kohl's policy, an employee with a negative UA balance is considered to have voluntarily resigned from his or her position and is terminated. (*Id.* ¶¶20–21.) If an employee receives approved personal leave, it will reduce the employee's UA balance but will not cause the UA balance to go negative. (ECF No. 32 ¶31.) Because FMLA leave is protected, an employee's FMLA leave does *not* count against or reduce the employee's UA balance. (ECF No. 48.)

Kohl's uses an email system to notify employees of their UA balances. After an employee utilizes UA hours, an email is automatically sent to the employee updating the employee on his or her UA balance. (ECF No. 28 ¶23.) Because the employee is the one who codes the absence, the accuracy of the balance in the email depends on the accuracy of the employee's own reporting. (*Id.* ¶24.) Thus, if an employee incorrectly codes an absence as FMLA leave instead of UA, the email with the employee's remaining UA balance will not be reduced, because FMLA does not count against the employee's UA balance. (*Id.*) And the resulting UA balance reported in the email received by the employee will be inaccurate, because the employee has incorrectly coded the leave. (*Id.*)

As a general practice, Kohl's takes its employees' coding of their absences in Verint at their word. (*Id.* ¶45.) Kohl's supervisors will, however, periodically perform audits of employees' reporting in Verint to ensure that any absences coded as FMLA leave in Verint match Sedgwick's

records. (*Id.* ¶47.) In the event of a discrepancy, the supervisor will contact both the employee and Sedgwick to try to resolve the inconsistency. (*Id.* ¶48.) Depending on what the supervisor finds, the supervisor may correct the coding in Verint, but Kohl's supervisors cannot change Sedgwick's reporting. (*Id.*)

### 3. Lacy's Compliance with Kohl's Leave Policies and Procedures

Lacy has suffered from rheumatoid arthritis since she was a child and experiences periodic joint inflammation, stiffness, and pain. (ECF No. 32 ¶1.) Based on her rheumatoid arthritis, on January 1, 2022, Lacy requested FMLA intermittent leave through Sedgwick. (ECF No. 28 ¶52.) Sedgwick approved her request on February 8, 2022 and informed Lacy that her FMLA intermittent leave would continue through September 16, 2022. (*Id.*; ECF No. 25-11 at 5.)

As the expiration date for Lacy's FMLA intermittent leave approached, Sedgwick notified her that, if she wanted to extend her FMLA intermittent leave, she needed to complete and return a new medical certification by September 29, 2022. (ECF No. 28 ¶53.) Lacy responded, indicating that she wanted to extend her FMLA intermittent leave. (ECF No. 25-1 at 76:17–77:2.) But Lacy never followed up by providing the required documentation. (ECF No. 28 ¶55.) On September 22, 2022, Sedgwick sent Lacy a reminder, but Lacy still did not respond, and, on September 30, 2022, Sedgwick denied her request based on her failure to submit the required medical documentation. (*Id.* ¶¶54–55.) Sedgwick sent Lacy notice of the denial. (*Id.*)

Lacy remained employed at Kohl's and continued to take various forms of leave. On October 1, 2022, Lacy's UA balance renewed, giving her 60 hours of UA leave to use over the next six months. (*Id.* ¶56.) Between October 1 and December 20, 2022, Lacy utilized 44.25 hours of UA leave. (*Id.* ¶57.) Even though her request for FMLA intermittent leave had been denied, Lacy (improperly) coded 22.5 hours of absences as FMLA leave. (*Id.* ¶¶57, 76.) These absences should have reduced Lacy's UA balance, but because she had incorrectly coded them as FMLA leave and not UAs, Kohl's system did not reduce her UA balance and Lacy received emails reflecting an inflated and incorrect UA balance. (*Id.* ¶¶24, 57, 76, 83.) By December 20, 2022, Lacy only had 15.75 hours of UA leave left. (*Id.* ¶57.)

On December 27, 2022, Lacy contacted Sedgwick to renew her request for a new period of intermittent FMLA leave for her rheumatoid arthritis. (*Id.* ¶60.) She was absent that same day and reported the absence to Sedgwick. (*Id.* ¶61.) Lacy suffered from other health complications at the time and, in fact, was admitted to the hospital from December 28, 2022 through January 1,

2023, causing her to miss two more days of work. (*Id.* ¶63.) After being released from the hospital, Lacy missed work again from January 3 through January 5, 2023. (*Id.* ¶64.) During this period, Lacy remained in contact with her supervisor, Heim, who coded all of Lacy's absences in Verint as FMLA. (*Id.* ¶65.) During their conversations, Heim reminded Lacy that she needed to notify Sedgwick of her absences as required by Kohl's policy, but Lacy failed to do so. (*Id.* ¶¶66, 83.)

On January 5, 2023, Lacy suffered a miscarriage. (ECF No. 32 ¶12.) She promptly informed Heim of her medical situation the next day, and Heim offered her three bereavement days off work and told her she could use FMLA or UA hours for any additional absences. (ECF No. 28 ¶¶67–69.) Lacy took the three bereavement days Heim had offered as well as an additional two days off. (*Id.* ¶70.) Lacy coded the additional days as FMLA leave in Verint, but she again failed to notify Sedgwick of her absences, contrary to Kohl's policy. (*Id.* ¶¶71, 76.)

On January 13, 2023, Sedgwick approved Lacy's renewed request for intermittent FMLA leave and confirmed she was approved to take that leave from December 27, 2022 through December 26, 2023. (*Id.* ¶72; ECF No. 25-18 at 4.) The following workday, Lacy began utilizing her FMLA leave, coding her absences in Verint and notifying Sedgwick of the absences. (ECF No. 28 ¶92; ECF No. 48.) She also continued to utilize her UA hours for additional time off and took a total of 24 UA hours between January 19 and February 10, 2023. (ECF No. 28 ¶92.)

On February 14, 2023, Heim audited Lacy's reporting and discovered multiple discrepancies between Verint's coding and Sedgwick's records. (*Id.* ¶¶75–76.) The records did not match for: October 24, 2022, November 10 and 28, 2022, December 28–29, 2022, January 3–5, 2023, and January 12–13, 2023. (*Id.* ¶¶76, 81.) Heim concluded that if the days that Lacy had coded in Verint as intermittent FMLA leave were re-coded as UAs, as Sedgwick's records suggested, Lacy's UA balance would drop to -70.25 hours, resulting in her automatic termination under Kohl's policy. (*Id.* ¶83.) Heim immediately contacted Lacy and instructed her to call Sedgwick to ensure it had accurately recorded her absences. (*Id.* ¶77.) Lacy called Sedgwick that same day and asked it to report her December 28–29, 2022, January 3–5, 2023, and January 12–13, 2023 absences as FMLA.[2] (*Id.* ¶81.)

---

[2] Lacy maintains that Sedgwick told her it could not approve her leave as FMLA unless a supervisor from Kohl's told it to do so. (ECF No. 32 ¶24.) This assertion appears to be hearsay. *See* Fed. R. Evid. 801. At oral argument, Lacy's counsel argued that Sedgwick is an agent of Kohl's, making its statements non-hearsay under Rule 801(d)(2)(D). (ECF No. 46 at 22:10–12.) The Court ordered supplemental briefing on the issue. (ECF No. 45.) If an agent makes a statement outside the scope of his or her actual or implied authority, it will not be attributed to the principal. *Boehck Constr. Equip. Corp. v. Voigt*, 115 N.W.2d 627, 633 (Wis. 1962) (citing Restatement (Second) of Agency § 285 (Am.

Heim also contacted Sedgwick to confirm the accuracy of its reporting. (*Id.* ¶78.) Sedgwick informed Heim that Lacy did not have intermittent FMLA for any absences before December 27, 2022. (*Id.* ¶79.) Sedgwick also denied Lacy's belated requests for FMLA leave for December 28–29, 2022, January 3–5, 2023, and January 12–13, 2023. (*Id.* ¶¶81–83.) Lacy had not requested FMLA intermittent leave for these absences on the dates they were taken, as Kohl's policy required. (*Id.* ¶¶61–66, 71, 76, 81–83.)

On February 28, 2023, Heim terminated Lacy's employment with Kohl's because her UA hours were "in a negative balance." (*Id.* ¶91; ECF No. 29-10.) The termination correspondence indicated that Lacy's UA balance had gone negative "as a result of [her] absence" on December 29, 2022. (ECF No. 28 ¶91; ECF No. 29-10.)

On March 1, 2023, Lacy called Kohl's to question her termination, and the company responded with an investigation. (ECF No. 28 ¶¶93–94; ECF No. 24 ¶6.) That same day, Sedgwick reversed its denial of Lacy's request for FMLA leave, but only for the December 28 and 29, 2022 absences. (ECF No. 28 ¶84; ECF No. 46 at 25:14–26:10.) As a result, Lacy received credit for another 18 UA hours, but her overall UA balance remained negative (-52.25) as of February 14, 2023. (ECF No. 28 ¶¶84–85.)

## LEGAL STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine"

---

L. Inst. 1958)). Presuming Sedgwick was Kohl's agent, Lacy does not explain how the statement would have been made within the scope of the agency relationship. Lacy admits that (1) Sedgwick administers Kohl's FMLA policy and maintains all administrative functions and determinations; and (2) only Sedgwick has the authority to overturn an employee's late-reported absence. (ECF No. 28 ¶¶29, 31.) In any event, this fact is immaterial to the Court's summary judgment analysis.

only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Upon such a showing, the burden shifts to the opposing party to "make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). This burden is not onerous, but the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

If the parties assert different characterizations of the facts, the Court must view the record in the light most favorable to the non-moving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

## ANALYSIS

The FMLA provides eligible employees suffering from serious medical conditions with up to twelve weeks of unpaid leave during any twelve-month period. 29 U.S.C. § 2612(a)(1)(D). FMLA leave may be taken on an intermittent schedule when medically necessary. § 2612(b)(1). The statute also prohibits employers from interfering with or retaliating against an employee who uses or attempts to use FMLA leave. § 2615(a). To succeed on an FMLA interference claim, the plaintiff-employee must show: (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of intent to take FMLA leave; and (5) she suffered "prejudice," or harm, from the violation,

including the denial of FMLA benefits. *See Ziccarelli v. Dart*, 35 F.4th 1079, 1084–85 (7th Cir. 2022). To succeed on an FMLA retaliation claim, the plaintiff-employee must show: (1) she was engaged in statutorily protected activity; (2) the employer took adverse action against her; and (3) the protected activity caused the adverse action. *Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018) (citing *Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th Cir. 2012)).

If an employer violates the FMLA, the eligible employee is entitled to "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation," along with liquidated damages, interest, fees, and costs. 29 U.S.C. § 2617(a)(1), (3). The recovery of damages requires proof of "a direct connection between the harm suffered and the damages sought." *Hickey v. Protective Life Corp.*, 988 F.3d 380, 388 (7th Cir. 2021) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). No damages can be awarded "unless the employee has been prejudiced by the violation." *Ragsdale*, 535 U.S. at 89. If the employee has not suffered compensable damages at the time of the adverse action, the employee is not entitled to an award under Section 2617. *Hickey*, 988 F.3d at 389.

Lacy contends that her termination constituted unlawful FMLA interference and retaliation and seeks damages for these alleged violations under Section 2617. (ECF No. 26 at 15–18.) Kohl's argues that it is entitled to summary judgment because the undisputed facts establish that Lacy was properly terminated after her UA balance went negative. (ECF No. 20 at 19.) It further maintains that Lacy's absences were not FMLA protected and that she failed to comply with the company's notice requirements, defeating her FMLA interference claims. (*Id.* at 21–25.) Kohl's also argues that Lacy's retaliation claim fails because the record establishes she was terminated for her negative UA balance and there is no evidence showing a causal connection between her termination and her use of FMLA. (*Id.* at 25–28.) Finally, Kohl's insists that Lacy has failed to establish damages under Section 2617, thus defeating both of her claims. (*See id.* at 20–21.)

For the reasons set forth below, the Court agrees that Lacy was not prejudiced by her termination, as required to obtain damages under Section 2617. It is undisputed that Lacy's UA balance was negative at the time she was terminated. Because the record confirms that an employee with a negative UA balance was considered to have voluntarily resigned from his or her position and terminated under Kohl's policy, Lacy cannot prove that she was damaged, even if Kohl's violated the FMLA. Accordingly, Kohl's motion for summary judgment will be granted.

I. **Lacy Has Failed to Establish Damages Under Section 2617, and Summary Judgment Must Be Awarded to Kohl's.**

Kohl's maintains that, even if Lacy's January absences were deemed FMLA protected, the record confirms that she was properly terminated because she would have had a negative UA balance of -12.25 on February 10, 2023, before the February 14 audit was conducted, and would therefore have been subject to termination on February 28, 2023 in any event. (*Id.*) Kohl's maintains that since it is undisputed an employee with a negative UA balance is subject to termination, Lacy has failed to prove damages and summary judgment must be granted in its favor. (*Id.* at 20–21.)

The record confirms Kohl's position. Lacy concedes that all her absences before December 27, 2022 were not FMLA protected. (ECF No. 28 ¶59.) This is fatal to her damages claim. While she insists that her January 3–5 and January 12–13, 2023 absences were FMLA leave protected, even if she was granted FMLA leave for those absences, her UA balance would still be negative. (*Id.* ¶92.) Lacy's problem is that she improperly coded a number of her absences in late 2022 as FMLA intermittent leave, but at that time she had not been granted FMLA intermittent leave and not yet even applied for a renewed period of leave. Taking those improperly coded absences into account, Lacy was left with a UA balance of 11.75 hours as of January 13, 2023. (*Id.*; ECF No. 48.) She then used another 24 hours of UA leave between January 13 and February 10, 2023. (ECF No. 28 ¶92; ECF No. 48.) This gives her a negative UA balance, which, under Kohl's policy, would have resulted in her termination.

During her February 14, 2023 audit, Heim determined that Lacy had a negative UA balance of -70.25. (ECF No. 28 ¶83.) Lacy disputes this balance, but solely based on Heim's failure to credit her January 3–5 and January 12–13, 2023 absences as FMLA protected. (*See* ECF No. 48.) As explained above, the record and basic math confirm that even if those days should have been deemed FLMA protected (which Kohl's disputes), Lacy would still have had a negative UA balance as of February 10, 2025, albeit a smaller negative balance of only -12.25 hours, but a negative balance nonetheless. (ECF No. 28 ¶92.) It is undisputed that Kohl's terminates employees with *any* negative UA balance. (*Id.* ¶¶20–21.) Thus, Lacy has not shown and cannot show that she was prejudiced by any potential FMLA violation; her February 28 termination was inevitable given her undisputed negative UA balance. *See Hickey*, 988 F.3d at 387–89. Therefore,

even if Kohl's improperly refused to credit her January absences as FMLA leave, Lacy cannot prove damages. This is fatal to her FMLA claims.

In response, Lacy insists that "there is a genuine dispute over whether [her] UA balance was negative." (ECF No. 26 at 9.) She asserts that her other absences were for "approved personal leave" and, under Kohl's policy, those dates would not cause her UA balance to go negative. (*Id.* at 8.) But Lacy fails to identify any specific days that she claims should be counted as "approved personal leave" and offers no evidence that any of the days she was absent should be treated in this way. Lacy appears to be claiming that every day labeled as UA should be deemed approved personal leave, but she offers no evidence for that assertion. The Court cannot conclude that a fact is disputed at summary judgment unless the party claiming that the fact is in dispute offers proper evidentiary support for that proposition. *See* Fed. R. Civ. P. 56(c)(1); *Stewart v. RCA Corp.*, 790 F.2d 624, 628 (7th Cir. 1986) ("Rule 56(c) suggests that the [summary judgment] decision should be made on affidavits and documentary evidence . . . ."). And "[w]hen a party fails to support a factual assertion in connection with a motion for summary judgment," the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1109 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(e)). Lacy's only citation is to Kohl's general absence policy. (ECF No. 26 at 8–9 (citing ECF No. 27 ¶31).) That policy simply says that an employee's UA balance will be reduced for absences due to "[a]n approved personal leave, but it will not cause [the employee's UA hours] to go into a negative balance." (ECF No. 22-1 at 5.) It does not by itself support a finding that any of Lacy's absences were approved personal leave—it merely indicates that Kohl's offers this type of leave.

Lacy also claims that "Heim admitted during deposition, and in all of her text messages to Lacy, that her absences were approved." (ECF No. 26 at 9.) Lacy again provides no deposition transcripts or other admissible evidence to support this proposition. The only record evidence on this point is that Heim was aware of Lacy's absences and supportive of Lacy's need for leave. (*See* ECF Nos. 25-2 & 29-2.) There is nothing in the record showing Heim admitting that any of Lacy's absences were approved personal leave. To the contrary, Heim told Lacy that she could "*continue* to use FMLA or UA" hours, (ECF No. 29-2 at 10 (emphasis added)), suggesting, at best, that Heim

understood that Lacy was using FMLA or UA hours when absent, *not* that she was approving Lacy taking personal leave. Lacy's argument thus fails based on a lack of evidence.

II.  **Lacy's Remaining Arguments Do Not Address Her Lack of Damages.**

Lacy's other arguments do not address her lack of damages. Lacy argues that Kohl's UA balance records were "ever-changing" and "conflicting." (ECF No. 26 at 16.) But, even if true, the record confirms that she bears responsibility for much of the problem. It is undisputed that an employee's reported UA balance depends on the accuracy of an employee's own coding. (ECF No. 28 ¶45.) It is also undisputed that Lacy herself incorrectly logged 22.5 hours as FMLA leave from October 1 through December 26, 2022 when those absences should have been coded UA. (*Id.* ¶¶53–58; ECF No. 48.) Her own coding errors thus resulted in her UA balance being inflated, and she cannot blame Kohl's if her reported balance was incorrect. It is further undisputed that while Lacy initially logged 21.75 hours as UA during that timeframe, she actually used 44.25 UA hours by December 26, 2022. (ECF No. 48.) As a result of the February 14 audit, Heim corrected the coding on Lacy's hours, causing a dramatic change in Lacy's UA balance. (ECF No. 28 ¶¶57, 76, 83.) Lacy has only herself to blame for the "ever-changing" UA hours reported in her email balance.

Lacy complains that Kohl's went back six months searching for violations of its absence policy as a way to punish Lacy for taking FMLA leave. (ECF No. 26 at 17.) To the extent this is an attempt to create a new basis for her retaliation claim, Lacy fails to support this theory with evidence. The record confirms, and Lacy herself concedes, that Kohl's supervisors performed periodic audits. (ECF No. 28 ¶47.) There is no evidence that the February 14 audit was out of the ordinary, let alone in retaliation for Lacy's request for FMLA leave. Because Lacy's UA balance was set to renew at the end of March, a mid-February audit to ensure accuracy of the expiring balance was entirely sensible.

Lacy fares no better in claiming that Kohl's should have used "progressive discipline" instead of terminating her. (ECF No. 26 at 17.) There is no evidence that Kohl's used progressive discipline for employees with a negative UA balance. To the contrary, Lacy does not dispute that an employee's negative UA balance will result in that employee's termination. (ECF No. 28 ¶¶20–21.) Because the undisputed facts confirm that she was subject to termination for exceeding her allowed UA hours during the period, consistent with Kohl's policy, it is irrelevant that Kohl's could have had a different policy and imposed some lesser discipline.

In her supplemental briefing, Lacy offers further arguments to try to avoid the consequences of her having exceeded her authorized UA balance.[3] She accuses Kohl's of changing its position on her actual UA balance in its briefing. (ECF No. 47 at 2–3.) She notes differences in a chart included in Kohl's initial brief and the parties' joint UA balance chart later submitted at the Court's request. (*Id.* (citing ECF No. 20 at 14; ECF No. 48).) But Lacy is comparing apples to oranges. The chart in Kohl's initial briefing shows Lacy's hours *before* Sedgwick overturned her December 28–29, 2022 absences from UA to FMLA. (ECF No. 20 at 14.) The chart cited in the joint UA balance chart shows Lacy's hours *after* Sedgwick reversed its decision and credited her December 28–29, 2022 absences as FMLA leave. (ECF No. 48.)

Lacy latches onto her termination letter, which lists December 29, 2022, as her termination date, and insists that because Kohl's concedes December 29 was an FMLA absence, her termination violated the FMLA. (ECF No. 47 at 1.) In essence, Lacy insists that Kohl's is *per se* liable for unlawful termination because her termination letter said she was fired for her absence on December 29, 2022 and Kohl's concedes that absence was covered by her subsequently approved FMLA intermittent leave. (*Id.*) This argument again fails to acknowledge that Lacy has no damages from any potential violation. Lacy violated Kohl's leave policy when her UA balance went negative, and Kohl's was therefore within its rights to terminate her. Lacy's FMLA protections do not entitle her to violate all of Kohl's policies without repercussion.

Finally, Lacy asserts that Heim's affidavit is a sham and should not be considered by the Court. (ECF No. 26 at 14.) The sham-affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (citing *Dunn v. Menard Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)). Lacy asserts that Heim's affidavit must be ignored because Heim admitted to "extraordinary circumstances" that "should have been taken into account" by Kohl's. (ECF No. 26 at 15.) But Lacy fails to explain how Heim's affidavit contradicts her deposition testimony. Nor does she provide a citation showing the alleged discrepancy. The Court's own review of the deposition transcript and affidavit does not reveal any contradiction. Lacy appears vexed by Heim's expressions of sympathy for her medical situation and her testimony that Lacy violated Kohl's

---

[3] Lacy's inclusion of these arguments in her supplemental brief was improper. The Court's order allowed supplemental briefing on the issues of hearsay and damages. (ECF No. 45.) Because these arguments would not change the Court's conclusion, it will explain why they fail.

leave policies. This does not make Heim's affidavit false. Heim might understandably sympathize with Lacy and simultaneously understand that Lacy's conduct was inconsistent with Kohl's policies, requiring her termination. These two points are not mutually exclusive.

## CONCLUSION

To be awarded monetary compensation under the FMLA, Lacy needed to provide some evidence that she suffered compensable harm at the time of her termination. *Hickey*, 988 F.3d at 388. Because the undisputed evidence proves that her termination was inevitable, she failed to meet this burden.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment, ECF No. 19, is **GRANTED**. The case is dismissed. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on March 24, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge